# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Criminal Action 2:11-cr-220 |
| v. | : | Judge Gregory L. Frost |
| BENJAMIN W. RICHARDSON, | : | Magistrate Judge E. A. Preston Deavers |
| Defendant. | : | |

## OPINION AND ORDER

On September 8, 2011, the Court held a detention hearing at the request of the United States based upon its assertion that Defendant, Benjamin W. Richardson, is both a flight risk and danger to the community. The Court heard the testimony of FBI Special Agent David Britton and received a report from Pretrial Services concerning various factors relevant to pretrial release or detention. For the following reasons, the United States' Motion for Detention is **GRANTED**.

## I.

Defendant has been employed as an Ohio State Highway Patrol Trooper since 1991. Defendant was charged in a criminal complaint filed September 6, 2011 with conducting a scheme to enrich himself and avoid personal liabilities by engaging in a wire fraud conspiracy in violation of 18 U.S.C. § 1349; wire fraud in violation of 18 U.S.C. § 1343; making false oaths in a bankruptcy proceeding in violation of 18 U.S.C. § 152(2); making false statements in a bankruptcy proceeding in violation of 18 U.S.C. § 152(3); and witness tampering in violation of

18 U.S.C. § 1512(b)(3).[1] According to the facts provided in the affidavit in support of the complaint, for which Agent Britton was the affiant and which he later corroborated during his testimony, Defendant allegedly engaged in a mortgage fraud conspiracy to defraud various mortgage lending institutions in obtaining $678,275 in loans by making false representations.[2] In particular, Defendant allegedly did not have to make down payments on three homes and received under-the-table kickbacks following the closings on the transactions. He purportedly misrepresented his income, assets and liabilities, and concealed that he did not actually provide down payments. Defendant also allegedly committed bankruptcy fraud by, *inter alia*, under-reporting his income for the years 2006 and 2007 and concealing income from a business, namely Icon Lounge, that he purportedly owned. The Government apparently does not seek detention on these financial crimes.

Agent Britton's testimony was primarily designed to inform the Court on the issues of safety of the community and Defendant's risk of flight. Agent Britton testified as to the

---

[1] A grand jury indicted Defendant of these charges on the day of the detention hearing, September 8, 2011. "[I]t has been long settled that the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006). A grand jury indictment bringing formal charges against the accused supersedes the complaint procedure and eliminates the necessity of a preliminary hearing. *Jaben v. United States*, 381 U.S. 214 (1965). Thus, at the time of the hearing, there was probable cause to believe that Defendant had committed the offenses.

[2] The rules regarding admissibility of evidence in criminal trials do not apply to the presentation of information at a detention hearing. The Court, therefore, may rely on hearsay evidence in making its determination regarding detention. 18 U.S.C. § 3142(f)(2). The Court emphasizes that the findings in this Opinion and Order are based on preliminary evidence which includes hearsay matters that may not be permissible during a final trial on the merits of this case. At the time of trial, all evidence will be subjected to a much more rigorous adversary proceeding. Nothing in this Opinion and Order shall be construed as modifying or limiting Defendant's presumption of innocence.

Government's concern regarding the danger for the community and the risk that Defendant would flee if released related to the charge of witness tampering. According to Agent Britton, Defendant misled an attorney with the intent to sever this attorney's relationship with a client, "Witness A," who was a witness to the alleged mortgage and bankruptcy fraud. Witness A allegedly had information that connected Defendant as an owner of the Icon Lounge, which is co-owned by Bobby Ferguson, who has now been indicted for conspiracy to distribute cocaine. The Government's theory regarding the charge of witness tampering is that Defendant made several misrepresentations to Witness A's attorney, "Witness B," in an effort to prevent the attorney from providing additional legal services towards obtaining the release of Witness A who was being held hostage in Mexico by a drug cartel.

Agent Britton provided background regarding the alleged witness tampering. Agent Britton testified that Witness A was a narcotics trafficker in Columbus and a purported friend or associate of Defendant. Witness A was the subject of a federal large-scale narcotics trafficking investigation in 2008 and 2009. On December 18, 2008, an Ohio State Highway Patrol Trooper pulled a pick-up truck over for traffic violations. Witness A was driving the truck, and was found to be carrying a loaded 9mm Glock pistol. The passenger had an outstanding Texas warrant for a probation violation related to a drug possession conviction. The rear of the truck contained several large boxes, which Witness A refused to permit the Trooper to inspect. At some point during the traffic stop, Witness A indicated that Defendant was his "brother," and called Defendant to ask for help. Again, Defendant was at that time an Ohio State Highway Patrol Trooper. Defendant spoke to the Trooper who was conducting the traffic stop, and asked him to "cut [Witness A] a break." The Trooper did not arrest Witness A, but instead cited him

for traffic violations and returned his pistol. During later interviews with Agent Britton, Witness A reported that he later thanked Defendant and made Defendant aware that illegal narcotics had been in the pickup truck at the time of the traffic stop.

On September 9, 2009, law enforcement conducted a traffic stop on a truck registered to and driven by Witness A. They seized a duffle bag containing more than $1,000,000 in U.S. currency. Less than three hours after the seizure, Witness A met with Defendant and engaged in an animated conversation, which law enforcement personnel witnessed because they had Witness A under surveillance. In a subsequent interview with Agent Britton, Witness A indicated that after the money was seized, he contacted Defendant for advice. Defendant allegedly told Witness A to get an attorney and to fabricate a story that he had found the money.[3] On September 11, 2009, Witness A was charged in a criminal complaint with conspiracy to possess with intent to distribute over five (5) kilograms of cocaine and marijuana. A warrant for Witness A's arrest was also issued.

Between November 2008 and September 2009, Defendant had over four hundred (400) contacts and attempted contacts with Witness A. Nine of those contacts lasted more than twenty (20) minutes.

After the seizure of $1,000,000, Witness A reported that he was being held in Mexico against his will because he was responsible for losing the money and a significant amount of narcotics that belonged to a Mexican drug organization. At his direction, Witness A's mother arranged for the services of an attorney, Witness B, for Witness A's future legal services. She

---

[3]The next day, law enforcement executed search warrants for storage units controlled by Witness A which revealed 68 kilograms of cocaine, hundreds of pounds of marijuana and $150,000 in U.S. currency.

4

provided $20,000 as a retainer which Witness A gave her prior to his disappearance. In late 2009 or early 2010, Witness A contacted Witness B, and informed him that he was alive and asked Witness B to negotiate his surrender to the federal arrest warrant that had been lodged against him.[4]

While Witness A was being held in Mexico, between January 2010 and May 2011, Defendant had forty-nine (49) contacts or attempted contacts with the girlfriend of one of Witness A's captors. Eight (8) calls with the captor's girlfriend lasted between one (1) and five (5) minutes. The girlfriend of the captor is an unindicted co-conspirator in Witness's A's narcotics charges.

The FBI sought and obtained a search warrant of Defendant's residence in connection with the investigation of mortgage and bankruptcy fraud. On June 9, 2010, the day of the search, and the following day, June 10, 2010, the FBI interviewed Defendant. Agent Britton questioned Defendant about his contacts with Witness A. He also asked Defendant whether he knew that $1,000,000 had been seized. Defendant acknowledged his familiarity with Witness A and indicated that he believed the money was likely drug money. Defendant did not report it to his supervisors or other law enforcement because, as he described it, it was obvious that a criminal investigation was ongoing. The FBI also probed Defendant about his ownership interest in Icon Lounge. Defendant denied having an ownership interest, instead insisting he was just an

---

[4]Witness A returned from Mexico in 2010 as a result of negotiations that occurred between his attorney (Witness B) and the Government. He was subsequently indicted, pleaded guilty and is awaiting sentencing.

5

investor.[5] These interviews with the FBI, however, made Defendant aware of the criminal investigation against him and that Witness A was a material witness.

Agent Britton also testified that he interviewed attorney-Witness B. Witness B indicated that shortly after the July 4, 2010 holiday, less than a month after the search of Defendant's home and his interviews with the FBI, he received a telephone call from a man who identified himself as Witness A's "brother," or "half-brother." This man was later identified as Defendant. According to Witness B, Defendant arranged a meeting with him. During the meeting, according to Witness B, Defendant represented that, "we are concerned as a family" that Witness A was dead. Witness B told Defendant that he had good reason to believe Witness A was alive. As Witness B reports it, Defendant attempted to obtain the balance of the retainer money Witness A had provided so that the family could have a memorial service and indicated that Witness A's mother and girlfriend were in agreement. Defendant also allegedly asked attorney-Witness B as to what he knew about a "Trooper" being involved in Witness A's case. Agent Britton testified that Defendant made several misrepresentations during this conversation, including that he was Witness A's brother, that Witness A's mother and girlfriend consented to and requested a return of the retainer, and that the family believed Witness A was dead and needed the money to pay for

---

[5]Ownership of the Icon Lounge is relevant to the mortgage and bankruptcy fraud charges to the extent that Defendant allegedly did not report any gross income derived therefrom. Moreover, the issue of ownership of the bar is also pertinent because, as a Trooper, Defendant would not have been permitted to own a bar or engage in outside employment without prior official approval.

For purposes of this Court's analysis here, Defendant's business associations with the Icon Lounge are material insofar as testimony at the detention hearing revealed that the Icon Lounge is a simple cash operation used as a drug-drop destination and to launder money from illicit narcotics transactions.

a memorial service.[6] Agent Britton also averred that he interviewed Witness A's mother and girlfriend. They both reported that Defendant contacted and met with them, and that he attempted to persuade them to assist him in obtaining the remainder of the attorney retainer fee. They each declined to assist Defendant.

During the hearing, Agent Britton also testified that he interviewed Plaintiff's ex-wife. During what was apparently a very acrimonious separation, Defendant allegedly threatened his now ex-wife's life. According to Agent Britton, during the interview, Defendant's ex-wife was guarded in her conversations regarding Defendant. She chose her words carefully and was very concerned about the ramifications of her statements. She indicated to Agent Britton that she once reported to the sheriff's office that Defendant physically assaulted her. She also told Agent Britton that she believed Defendant tried to cover up the incident. She showed Agent Briton text messages purportedly sent by Defendant in which he threatened to kill her, which she had saved since they were allegedly sent in 2007. Evidence at the hearing reveals that, on November 28, 2007, Defendant's ex-wife sought and obtained a domestic violence civil protection order that prohibits Defendant from contacting her and their young children until November 28, 2012.[7] She indicated in the petition that Defendant had been mentally and physically abusive for several years, and, because of the abusive relationship, she feared for her life. She noted that Defendant had threatened her life and had said he would hurt her if she brought anyone outside of their

---

[6]Defendant used his real name and provided the attorney with his actual telephone number.

[7]This relationship has evidently improved as counsel for Defendant indicated at the hearing that Defendant and his ex-wife attend their children's sporting events and spend time together during holidays. Nevertheless, these contacts constitute violations of an active protective order.

7

family into the house. *See* Exhs. DH-1 & DH-2, *Richardson v. Richardson*, No. 07 DVH 11 539, Delaware County Court of Common Pleas.

Agent Britton also testified that he interviewed other witnesses during this investigation. In particular, one witness who has pled guilty to the alleged mortgage fraud indicated that Defendant reached out to him, but did not communicate with him directly and instead contacted him through a telephone call to a third-party. According to Agent Britton, this indirect contact apparently caused the witness to feel intimidated by Defendant. This witness expressed concern for his own safety and asked if the FBI would protect him if he gave a statement that implicated Defendant in any criminal activity. The FBI has taken measures to protect this witness.

Information from the Pretrial Services Report reveals that Defendant is a lifelong resident of Columbus, Ohio. He served as a United States Marine and was honorably discharged in 1987. He presently leases a home in central Ohio, where he resides with his fiancee and two young children. The home would be available for purposes of electronic monitoring. He possesses a valid passport. Criminal records reveal that he has an assault conviction dating back to when he was nineteen years old and a traffic offense from 2002. In 2007, Defendant was charged with domestic violence and was placed under a protective order which prohibits contact with his ex-wife until November 28, 2012. The Pretrial Services Office recommended that Defendant be released on his own recognizance, placed under home detention with location monitoring, along with other conditions of release.

## II.

Under the Bail Reform Act of 1984, 18 U.S.C. §3142(f)(2)(B), a detention hearing may be held in a case involving, *inter alia,* a serious risk that the person to be detained will obstruct or

attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. Such a hearing may also be held if there is a serious risk that the person sought to be detained will flee or pose a danger to any person or the community. 18 U.S.C. § 3142(d)(2). At the conclusion of the hearing, the presiding judicial officer must determine whether any condition or combination of conditions of release "will reasonably assure the appearance of the person as required and the safety of any other person and the community. . . ." After such a hearing, "if the judicial officer determines that no such conditions of release exist, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

The Court considers the following factors in making its determination as to whether pretrial detention is appropriate: (1) the nature and circumstances of the offenses charged, including whether they are crimes of violence; (2) the weight of the evidence against the accused; (3) the history and characteristics of the individual, such as his or her character, physical and mental condition, family and community ties, criminal history and record concerning appearances in court when required; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). "The government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or the community by clear and convincing evidence." *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004) (unpublished).

### III.

The Court concludes that there are no conditions or combination of conditions of release that will reasonably assure this Defendant's appearance and the safety of the community. The

prosecution has proven by clear and convincing evidence that, if released, Defendant would be a danger others and the community. In arriving at these conclusions, the Court has considered the following factors together with the preliminary evidence from the detention hearing:

- **18 U.S.C. § 3142(g)(1) - The nature and circumstances of the offense charged, including whether the offense charged is a crime of violence or involves narcotics**

Defendant has been charged with two fraud schemes, one involving fraud on a federal bankruptcy court. Most troubling to the Court in this analysis is the charge for obstruction of justice and tampering with witnesses in this case. The target of this alleged obstructive conduct was a material witness in the investigation.

Long before the enactment of the 1984 Bail Reform Act, the law recognized a trial court's inherent authority to detain a defendant if necessary to "insure orderly trial processes," particularly "to protect future witnesses at the pretrial stage." *United States v. Gilbert*, 425 F.2d 490, 492 (D.C. 1969). "To be sure, the legislative history of the 1984 Bail Reform Act indicates that Congress intended to preserve the courts' then-existing power to confine defendants who had threatened jurors or witnesses in their own cases." *United States v. Simon*, 760 F. Supp. 495 (D. V.I. 1990) (citing S. Rep. No. 98–225,98th Cong., 2d Sess. at 7, 12, 15, 21, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3189; 18 U.S.C. 3142(f)(2)(B); *United States v. Coleman*, 777 F.2d 888, 894 (3d Cir. 1985); *United States v. Delker*, 757 F.2d 1390, 1400 (3d Cir.1985)); *see also United States v. Melendez-Carrion*, 790 F.2d 984, 1002 (2d Cir. 1986) (finding that detention may be validly imposed where record contains evidence of witness tampering). Federal courts have sanctioned pretrial detention of a defendant charged with obstruction of justice, even though the witness tampering did not involve threats or use of physical force. *E.g., United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000) (upholding

10

district court's detention of a defendant upon showing of probable cause to believe she engaged in non-violent witness tampering).

Here, there is probable cause to believe, as evidenced by the Indictment, that Defendant obstructed justice by tampering with a witness, knowing a criminal investigation was ongoing against him. The evidence also indicates that Defendant contacted two other witnesses, Witness A's mother and girlfriend, in an attempt to persuade them to intervene in the attorney-client relationship between Witness A and Witness B. Defendant orchestrated a meeting with Witness B and misrepresented that Witness A's mother and girlfriend were "on their way" and that they had consented to the return of the retainer. This Defendant is a law enforcement officer, who is sophisticated enough to know that an attorney will not perform services for a client without payment, and that obtaining the remainder of a retainer would effectively terminate the attorney-client relationship. All of this contact with witnesses occurred while Defendant was under investigation and after he knew Witness A was a material witness.

Notwithstanding Defendant's contention that his alleged conduct with regard to the witness tampering charge involved no physical force or threats of violence, this factor favors detention. *See LaFontaine*, 210 F.3d at 133 (finding no error in detention order despite alleged tampering involved nothing more than attempts to persuade a witness to lie and did not involve harassment or intimidation). The Court concludes, particularly given his status as a law enforcement officer, that even the non-violent forms of obstruction of justice pose a sufficiently serious danger to the community such that pretrial detention is warranted.

- **18 U.S.C. § 3142(g)(2) - The weight of the evidence against the accused**

This factor goes to the weight of the evidence of an accused's dangerousness or flight risk, not to the weight of the evidence pointing to a his or her guilt. *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). Here, the record contains evidence that Defendant threatened his ex-wife's life, and that she was concerned enough to keep the alleged text messages containing the threats for over three years. Another witness expressed concern for his safety and asked for protection from the Government if he cooperated. The preliminary evidence reveals hundreds of communications and attempted communications with an armed drug dealer and his alleged co-conspirator who has connections with Mexican drug organizations. The Court concludes that the weight of the evidence with respect to the danger presented to other persons and the community is substantial.

- **18 U.S.C. § 3142(g)(3) - The history and characteristics of the accused**

The Court credits the fact that Defendant is a lifelong resident of the central Ohio area and that he has significant family and community ties. These factors favor release. The Court also acknowledges that Defendant voluntarily spoke to the investigators, although according to the testimony at the detention hearing, his communications were less than forthright.

Of deep concern to this Court is the evidence related to Defendant's alleged obstructive conduct and his purported brazen attempts to manipulate witnesses for his own personal advantage. Even more troubling is that Defendant purportedly engaged in this conduct while serving as law enforcement officer accorded with public trust to enforce the law. *Cf. Gilbert v. Homar*, 520 U.S. 924, 932 (1997) (noting that police officers are "employees who occupy positions of great public trust and high public visibility").

12

Testimony revealed evidence that Defendant had knowledge of illegal narcotics trafficking and that he failed to report it, even though he is a law enforcement officer. There is evidence that he contacted or attempted to contact Witness A over 400 times between November 2008 and September 2000—a number of which lasted a significant period of time—even though he suspected Witness A was involved in drug dealing. Defendant had significant contact with others associated in the drug trafficking investigation. He had forty-nine (49) telephonic contacts or attempted contacts with the girlfriend of one of Witness A's captors in Mexico between January 2010 and May 2010, including eight (8) calls that lasted between one (1) and five (5) minutes. Defendant's business associations with the Icon Lounge also concern the Court to the extent that the testimony at the detention hearing revealed that the Icon Lounge is a cash operation attractive to drug dealers that is used to launder money and as a drug-drop destination.

In terms of his past conduct and criminal history, the Court is disturbed by Defendant's history of domestic violence and the alleged threats to kill his former wife. The state court issued a protective order prohibiting contact with his ex-wife which is still in place.

This factor, too, favors detention.

- **18 U.S.C. § 3142(g)(4) - The nature and seriousness of the danger to any person or the community that would be posed by the person's release**

As discussed more fully above, the Court stresses its significant concerns related to Defendant's alleged obstructive conduct and considers this conduct a serious danger to the community. Factored into this equation, too, is the fact that Defendant is a sophisticated law enforcement officer, who, among other things, purportedly abused his position to effect a favorable outcome during a traffic stop of Witness A.

13

The Court also affords great significance to the evidence related to Defendant's alleged past conduct involving his ex-wife. The Court acknowledges that Defendant's relationship with his ex-wife has dramatically improved. Defendant's ex-wife, however, is a material witness in this case with respect to the alleged mortgage and bankruptcy fraud. The Court finds compelling the need to protect all individuals in the community. Defendant's newly-acquired knowledge that she cooperated with investigators heightens the Court's concern for her safety in light of their relatively recent violent history.

Moreover, evidence adduced at the hearing indicates that at least one material witness is concerned for his safety because he is cooperating with the FBI in Defendant's case. His identity and the fact that he is cooperating were revealed to Defendant during the detention hearing. Indeed, the identities of numerous witnesses in this case were made available to Defendant during the hearing. Under these circumstances, the level of danger to individuals in the community increases substantially.

For all of these reasons, the Court concludes that Defendant should be detained pending final resolution of this case on the merits. The United States' Motion for Detention is **GRANTED**.

**IT IS SO ORDERED.**

DATE: October 21, 2011

ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE